**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
WILLIAM SLACK,

                     Plaintiff,

         -against-

THE COUNTY OF SUFFOLK and Police
Officer KENNETH J. RIPP (P.O. No. 5439) in
his official capacity,

                     Defendants.
----------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
11-CV-2711 (ADS)(SIL)

**APPEARANCES:**

**Henry Law**
*Attorneys for the Plaintiff*
825 E. Gate Boulevard, Suite 106
Garden City, NY 11530
    By:   Chauncey D. Henry, Esq., of Counsel

**Law Offices of Frederick K. Brewington**
*Attorneys for the Plaintiff*
556 Peninsula Boulevard
Hempstead, NY 11550
    By:   Fredrick K. Brewington, Esq.
          Gregory Calliste, Jr., Esq., of Counsel

**Suffolk County Department of Law, County Attorney**
*Attorneys for the Defendants*
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, NY 11788
     By: Brian C. Mitchell, Assistant County Attorney

**SPATT, District Judge.**

On June 6, 2011, the Plaintiff William Slack (the "Plaintiff") commenced this action against the Defendants the County of Suffolk (the "County") and Suffolk County Police Officer Kenneth J. Ripp (P.O. No. 5439), in his official capacity ("Ripp" and, together with the County,

1

the "Defendants") pursuant to 42 U.S.C. § 1983.  The Plaintiff asserted federal claims of false arrest, malicious prosecution and abuse of process.  He also brought causes of action for malicious prosecution and abuse of process under New York State law.

In November of 2013, a trial was held, and at the conclusion of the evidence, the Court granted the County's Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 50(b) motion and dismissed the federal <u>Monell</u> claim against the County, so that the only remaining claims against the County were the state law causes of action, which were premised under a theory of <u>respondeat</u> <u>superior</u>.  On November 27, 2013, the jury returned a verdict in favor of the Plaintiff and against Ripp on the federal § 1983 false arrest claim, but in favor of the Defendants and against the Plaintiff on the federal and pendant state law claims for malicious prosecution and abuse of process.  The jury awarded the Plaintiff $5,000 in compensatory damages.

Presently before the Court is a post-trial motion filed by the Defendant under Fed. R. Civ. P. 50(b) and 59.  The Defendant seek judgment as a matter of law in their favor on the ground that Ripp is entitled to qualified immunity, or in the alternative, a new trial.

The Court pauses here to note that the Defendant's moving papers contain footnotes, which is contrary to this Court's Individual Rule II.A.  Notwithstanding this infraction, the Court will consider the Defendant's papers in rendering its decision.  However, the Court advises the Defendant's counsel that any future filings that contain footnotes will not be considered by this Court.

For the reasons that follow, the Defendant's motion is denied.

# I. BACKGROUND

## A. Underlying Facts

On July 12, 2009, the Plaintiff and his family were having a Christening party for their grandson at the Plaintiff's home in Lindenhurst, New York. During the party, two of the guests ended up having a minor car accident in front of the Plaintiff's house. In order to obtain a police report of the incident, the two guests called the police.

Hours later, the Defendant Ripp and his partner, Suffolk County Police Officer Matthew Friedrich arrived at the scene of the accident. The Plaintiff's daughter, Carol Slack, testified that at this time, she was standing in front of her father's house and observed Ripp and Friedrich race into the backyard of the home, where the Christening party was still taking place. She did not know what prompted Ripp and Friedrich to run into the backyard. However, according to Ripp and Friedrich, they were responding to fireworks that they claimed were being fired at them from the backyard.

Once in the backyard, Ripp and Friedrich escorted Peter Gange, who was the father of the baby that had been Christened and who testified as a witness in the trial, from the backyard to the front of the Plaintiff's house. Ripp then arrested Gange, allegedly using excessive force to do so.

About this time, Ripp claims that the Plaintiff tried to interfere with Gange's arrest. In this regard, on the day of the incident, Ripp initially claimed that the Plaintiff interfered with Gange's arrest by yelling and screaming in protest. Thereafter, when submitting a statement to the Suffolk County Police Departments' Internal Affairs Bureau, Ripp claimed that the Plaintiff was leading a group of the party guests that circled around him and Friedrich. At trial, Ripp testified that the Plaintiff interfered with his radio communications to headquarters.

However, all of the Plaintiff's witnesses, who were guests at the Christening party, testified that the Plaintiff did not interfere in any way with the arrest of Gange. Nevertheless, Ripp proceeded to arrest the Plaintiff for the crime of obstruction of governmental administration. This charge was ultimately dismissed. The Plaintiff claimed that Ripp's conduct in improperly arresting him caused him to be prosecuted without basis; wrongfully subjected to lengthy and costly criminal proceedings; and suffer psychological injuries leading to substantial medical bills.

Following the July 12, 2009 occurrence, Ripp's actions were subjected to an investigation by the Internal Affairs Bureau. This investigation apparently involved the review of the Plaintiff's 50-h hearing and multiple witness interviews. However, during the trial, the Defendants offered no evidence demonstrating that the Internal Affairs Bureau interviewed any witnesses, including independent civilian eyewitnesses who were present during the incident. Further, Ripp testified that he never spoke to the Internal Affairs Bureau concerning this matter other than the statement he submitted.

Similarly, Friedrich testified that he also never spoke directly to the Internal Affairs Bureau about the July 12, 2009 occurrence and other officers who eventually arrived at the scene were also never contacted by the Internal Affairs Bureau. In addition, Friedrich explained that although he and Ripp were supposed to submit independent statements to the Internal Affairs Bureau, they nonetheless collaborated with one another so that their statements were substantially similar.

Following the investigation, the Internal Affairs Bureau issued a memorandum exonerating Ripp, which the Plaintiff admitted into evidence without objection from the Defendants. According to the memorandum, Ripp had probable cause to arrest the Plaintiff.

This finding of the memorandum was endorsed by Lieutenant Thomas Kenneally, who conducted the investigation, and Captain Joseph Capolino, who reviewed the investigation, as well as by a Deputy Inspector and a Deputy Police Commissioner.

**B. The Jury's Deliberations**

On the morning of November 25, 2013, following a two week trial, the Court charged the jury on the applicable law. Thereafter, at approximately 3:07 p.m. that same day, the charge concluded and the jury began its deliberations. About an hour and a half later, at 4:30 p.m., the jury was recessed until the next day.

On November 26, 2013, the jury reconvened and commenced deliberations at approximately 9:40 a.m. At 12:15 p.m., the jury sent a note to the Court, which stated as follows: "We are deadlocked 8 to one on number 1 (False Arrest Charge). Juror says he will never budge. Please advise." (Tr. 1603.)

The Court informed the parties that it intended to give the jury a modified Allen charge, to which neither party objected. In addition, despite the Defendants objection, the Court stated that it would be advising the jury that they could still consider the Plaintiff's other claims in the event they were unable to reach a unanimous verdict as to the first cause of action.

The jury was brought into the courtroom, at which time the Court provided them with the Allen charge. In this regard, the Court stated the following:

> Members of the jury, I have this note saying that you are unable to reach a unanimous verdict as to the false arrest claim . . . . I estimate that you have been deliberating for about a little more than four hours. I assume that in that time each of you has had the opportunity to present your individual views about the case, that you consulted with one another and listened to and thought about the arguments of your fellow jurors. And after careful, conscientious consideration of the evidence, have nevertheless, at least one of you arrived at the view as to how the federal Section 1983 false arrest claim should be decided

5

> I must point out to you that this trial has lasted about two weeks and has been with some effort by everybody to try this case. If your deliberations don't end in agreement on a verdict, the case is necessarily left open . . . and in all likelihood will have to be tried again before another jury . . . . There appears to be no reason to believe the case will be differently tried or would reveal any more or different evidence than you have heard. Nor is there any reason to believe that nine or 10 different men and women will be more intelligent, more impartially chosen or more competent to decide this case than you are.
> Now, these considerations are but a reminder that the essential cast [sic] is one of conscientious decision which I feel that you are fully equipped to make, and while a jury must not surrender their conscientious convictions nevertheless it is your duty as jurors to consult with one another and to deliberate with a view to reaching agreement if you can possibly do so without doing violence to any judgment based upon a fair and impartial consideration of the evidence.
> . . . .
> In the course of your deliberations, you should not hesitate to reexamine your own views with candor and frankness and change your own opinion if convinced that it's erroneous. I can't emphasize too strongly that each of you should give attention to the views of the others, respect them, and listen to each other's arguments with a disposition to keep your own views under your continuing review. Further consideration may indicate that a change in original attitude is fully justified upon the law and facts . . . .
> . . . . I note that, I see that your note had to do with question number one. You are of course able to decide the other questions if you want to do so even though you may not agree on question number one. It's up to you.

(Tr. 1606–09.)

After the Court gave the above-recited <u>Allen</u> charge, the jury was recessed for lunch. About this time, the jury indicated to the Courtroom Deputy that one of the jurors wished to send a note and have the foreperson sign it, but that its contents were not agreed upon by the other jurors.

Lunch ended at approximately 1:30 p.m., at which point the jury sent out a note that sked "What is the difference between reasonable suspicion and probable cause?" (Tr. 1617.)

6

Subsequently, as the Court and the parties were discussing this note, the jury sent out another note indicating that it no longer needed an answer concerning the difference between probable cause and reasonable suspicion.

The jury also sent out an additional note asking the Court for guidance as to the terms "actual malice" and "intent." The Court had the jury brought into the jury room and addressed this note. At 2:10 p.m., the jury returned to deliberating.

However, five minutes later, at 2:15 p.m., the jury sent out a note stating "juror number 7 . . . dismiss number 7." (Tr. 1626–27.) The Court explained to the parties that according to the foreman, juror number 7 had wanted to speak to the Courtroom Deputy about being dismissed, and the Courtroom Deputy advised the foreman to send a note. Juror number 7 was not the same juror who had, as discussed above, expressed interest in sending his own note separate from the other members of the jury.

Privately, but on the record, the Court spoke with juror number 7. The Court asked juror number 7 why he wanted to be dismissed, but juror number 7 indicated he could not inform the Court of his reasons because it would revealing the jury deliberations. Juror number 7 then said that he would go back in, and the Court "suggest[ed] [he] do the best that [he] [could]." (Tr. 1630.)

Thereafter, the jury, including juror number 7, resumed deliberations. The jury sent out another note again asking about the difference between reasonable suspicion and probable cause. The Court discussed the note with the parties and then entered the jury room and answered the question presented in the note.

Approximately six hours into the jury deliberations, at about 3:20 p.m. on November 26, 2013, the jury sent out a note advising the Court as follows: "Jury is still hung 8-1 on charges 1

7

and 2. Juror will not budge." (Tr. 1642.) As such, the Court presented the parties with the following three options: (1) that the Court declare a mistrial and discharge the jury; (2) that the jury be instructed to cease their deliberating for the day and return the following morning to resume deliberations; or (3) that the jury continue deliberations for the remainder of the day.

The Plaintiff stated that they wished for the jury to keep deliberating and suggested that the jury be given the option of whether to continue deliberating that day or to stop deliberating and resume the next morning. Conversely, the Defendants stated that a mistrial should be declared and the jury disbanded. However, the Defendants further stated that, in the event the Court decided to allow the jury to keep deliberating, that they believed the deliberations should continue that afternoon rather than being recessed and resuming the following morning.

After hearing the parties' positions, the Court determined that it would permit the jury to continue with their deliberations, but that it would have the jury end deliberating for the day and instruct them to return the following morning, when they would recommence deliberations. At this time, the Court noted the weather forecast and that one juror resided in Staten Island, thereby making it possible that the jurors would not want to return the next day.

The Court then entered the jury room and advised the jury as follows:

> I received a note in [sic] the jury, jury is still hung, 8–1 on charges one and two. Juror will not budge. You have spent approximately six or six and a half hours of deliberation. That is not a very long time in a trial of this length. And so, I am proposing that we terminate your deliberations for today and come back tomorrow morning, start fresh tomorrow morning and see what happens.
> . . . .
> I think that is the right thing to do. A lot of effort was put into this and we'll see. You still have the right to your own opinion, of course, based upon the evidence, and the law and your own conscience. So we're going to recess until tomorrow morning at 9:30[.]

8

(Tr. 1646.)

Afterward, the Court returned to the courtroom and informed the parties that it had recessed the jury and that the jury would return in the morning. The Court further explained that the Jury "seemed very happy to come back tomorrow morning"; that the Court did "not put[ ] them under any kind of pressure at all"; and that "the atmosphere in the jury room was very friendly[.]" (Tr. 1650.)

The following day, November 27, 2013, which was the day before Thanksgiving, the jury returned and recommenced deliberations at about 9:37 a.m. Less than an hour later, at 10:30 a.m., the jury sent out a note, which stated as follows: "Jury is deadlocked. All nine members feel this will not change." (Tr 1654.)

In light of this note, the Plaintiff asked the Court to give the jury a second <u>Allen</u> charge and to allow the jury to keep deliberating. In contrast, the Defendants sought an order from the Court declaring a mistrial and discharging the jury.

The Court held that it would permit the jury to continue deliberations until lunchtime. The Plaintiff did not object, but the Defendants restated their position that a mistrial should be granted.

Rather than bring the jury into the courtroom, the Court entered the jury room and instructed the jury as follows:

> The note says jury is deadlocked. All nine members feel this will not change. What I'm going to [do] is give you one more opportunity to reach an agreement. The trial has been a fairly long one. As I told you if we have to try the case over again, there will be another jury similar to you. They will hear probably the same evidence, a lot of effort has been put into it, but of course, you keep your conscientious thoughts. That doesn't mean that you don't have to keep your conscientious findings and decisions. But since we've already ordered lunch, we're going to give you lunch and then we'll see what happens.

9

(Tr. 1658.) The Court added that "you're a very good group" and that "I really enjoy having you." (Tr. 1658.)

At 12:30 p.m. that same day, the jury received their lunches. Since a verdict had not yet been reached by this time, the Defendants moved for a mistrial. However, the Court denied the Defendants' motion and allowed the jury deliberations to continue. Thereafter, at 1:15 p.m., the jury returned with the verdict.

## II. DISCUSSION

### A. Legal Standards

#### 1. Legal Standard Under Fed. R. Civ. P. 50(b)

In substance, Fed. R. Civ. P. 50(b) provides that if a jury returns a verdict for which there is not a legally sufficient evidentiary basis, the district court may either order a new trial or direct the entry of judgment as a matter of law. In order to grant a motion pursuant to Fed. R. Civ. P. 50(b), there must be a "'complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [and women] could not arrive at a verdict against [it].'" Lavin-Mceleney v. Marist College, 239 F.3d 476, 480 (2d Cir. 2001) (quoting DiSanto v. McGraw-Hill, Inc., 220 F.3d 61, 64 (2d Cir. 2000)); see also Concerned Area Residents for Environment v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994); Song v. Ives Lab., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992); Mattivi v. South African Marine Corp. "Huguenot", 618 F.2d 163, 168 (2d Cir. 1980).

"The same standard that applies to a pre-trial motion for summary judgment pursuant to Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50." Piesco v. Koch, 12 F.3d 332, 341 (2d Cir. 1993); see also the Advisory

10

Committee Note to the 1991 Amendment of Fed. R. Civ. P. 50. This Rule is well and clearly explained in the seminal case of This Is Me, Inc. v. Elizabeth Taylor, 157 F.3d 139 (2d Cir. 1998). In Taylor, the Court commented that the then recent adoption of the term "judgment as a matter of law" to replace both the term "directed verdict" and the term "judgment N.O.V." was intended to call attention to the close relationship between Rule 50 and 56. 157 F.3d at 142. The Court then went on to explain the basis for granting a post-verdict Rule 50 motion, as follows:

> A district court may not grant a motion for a judgment as a matter of law unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154–55 (2d Cir. 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)) (internal quotation marks omitted). Weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that "a reasonable juror would have been compelled to accept the view of the moving party." Piesco, 12 F.3d at 343.

Id.; see also Fabri v. United Techs. Int'l Inc., 387 F.3d 109, 119 (2d Cir. 2004) (same); Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).

When ruling on a Fed. R. Civ. P. 50(b) motion, a court must "'consider the evidence in the light most favorable to the [non-moving party] and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence.'" Concerned Residents for the Env't v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994), cert. denied, 514 U.S. 1082, 115 S. Ct. 1793, 131 L. Ed. 2d 721 (1995), (quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988)). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S. Ct. 2097 (2000); Meloff v. New York Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001). Accordingly, when ruling on a motion brought pursuant

to Rule 50, the court may not rule on the credibility of the witnesses or the weight of the evidence. Caruso v. Forslund, 47 F.3d 27, 32 (2d Cir. 1995). Rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury. See Williams v. Cnty. of Westchester, 171 F.3d 98, 101 (2d Cir. 1999).

A Fed. R. Civ. P. 50(b) motion is thus "proper only if 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Fiacco v. City of Rensselaer, 783 F.2d 319, 329 (2d Cir. 1986) (quoting Simblest, 427 F.2d at 4). Such motions "should be granted cautiously and sparingly." 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524, at 252 (1995); Japan Airlines Co. Ltd. v. Port Auth. of New York & New Jersey, 178 F.3d 103, 112 (2d Cir. 1999).

**2. Legal Standard Under Fed. R. Civ. P. 59**

Under Fed. R. Civ. P. 59, a court "may, on motion, grant a new trial on all or some of the issues — and to any party — . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "'A motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998) (quoting Song v. Ives Labor, Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)). The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive. 12 Moore's Federal Practice, § 59.13[1] at 59-43 (3d Ed. 2005).

In comparison to a Rule 50 motion, the Second Circuit has held that the standard for a Rule 59 motion in some respects is less onerous for the moving party in two ways: first, "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." DLC Mgmt. Corp, 163 F.3d at 134. Second, in deciding a Rule 59 motion "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." Id. However, the granting of a new trial is an extraordinary relief, and one that "is properly granted only upon a showing of exceptional circumstances." Id. at 391.

**B.  As to the Defendant's Fed. R. Civ. P. 50(b) Motion**

In this case, the Defendants contend that Ripp is entitled to qualified immunity as a matter of law pursuant to Fed. R. Civ. P. 50(b) based on the memorandum from the Internal Affairs Bureau stating that an investigation into the July 12, 2009 demonstrated that Ripp had probable cause for the actions he took in arresting the Plaintiff.  In this regard, the Defendants argue that at no point during the trial did the Plaintiff introduce affirmative evidence to attack or impeach the veracity or probative value of the memorandum.

"In New York, the claim colloquially known as 'false arrest' is a variant of the tort of false imprisonment, and that tort is used to analyze an alleged Fourth Amendment violation in the § 1983 context." Ostroski v. Town of Southold, 443 F.Supp.2d 325, 334 (E.D.N.Y. 2006). To prevail, a plaintiff must prove four elements: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not contest the confinement, and (4) the confinement was not otherwise privileged." Broughton v. State, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975), cert. denied, 423 U.S. 929, 96 S. Ct. 277, 46 L. Ed. 2d

13

257 (1975) (internal citations omitted). With respect to the last element, an arrest is considered privileged as a matter of law if it is supported by probable cause.

Of importance, "[e]ven if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Id. "Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact[,]" and "[t]he ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, i.e., whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court." Zellner v. Summerlin, 494 F.3d 344, 367 (2d Cir. 2007) (citations omitted). However, "[t]he burden of raising and establishing the affirmative defense of qualified immunity . . . rests on the [D]efendants." Sabir v. Jowett, 214 F. Supp. 2d 226, 240 (D. Conn. 2002) (citing Lee v. Sandberg, 136 F.3d 94, 101 (2d Cir. 1997)).

In this case, the Court is unconvinced that Ripp is entitled to qualified immunity as a matter of law based solely on the one exhibit relied on by the Defendants. Considering the evidence in the light most favorable to the Plaintiff, as the non-moving party, the Court finds that the jury could have reasonably discredited as unreliable the memorandum's finding that Ripp had probable cause in arresting the Plaintiff. See Lavin-Mceleney v. Marist College, 239 F.3d 476, 480 (2d Cir. 2001) ("We will reverse [the denial of the defendant's Rule 50(b) motion by the district court] only if the evidence, drawing all inferences in favor of the non-moving party

14

and giving deference to all credibility determinations of the jury, is insufficient to permit a reasonable juror to find in [the plaintiff's] favor.").

In this regard, the testimony of Ripp and Friedrich, indicated that the Internal Affairs Bureau never interviewed either officer concerning the July 12, 2009 occurrence, thereby undercutting the claim that a thorough investigation was conducted. Moreover, guests of the Christening party testified that the Plaintiff never interfered with Ripp's arrest of Gange, which the jury was entitled to credit over the opinions of the police officers found in the memorandum. Lastly, as recited above, the jury was presented with three different accounts from Ripp as to how the Plaintiff interfered with his arrest of Gange, one of which Ripp provided in a statement to the Internal Affairs Bureau. Given that Ripp gave multiple, inconsistent versions of the events, it is only reasonable to believe that the jury would be dubious about any finding that relied on any one story, including the Internal Affairs Bureau's investigation and resulting memorandum.

In any event, "[t]he [C]ourt is not permitted as a fact to find as a proposition that is contrary to a finding made by the jury" unless the moving party offers "[i]ncontrovertible evidence" that "so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." Zellner, 494 F.3d at 371 (citing Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686) (2007)). However, as the Court has demonstrated, far from being "incontrovertible evidence," the Internal Affairs Bureau memorandum which the Defendant relies on can easily be challenged on the grounds outlined above.

In sum, crediting, as the jury has, the evidence presented at the trial which supports the Plaintiff's position that the Plaintiff did not interfere with Ripp when he was arresting Gange, the

Court finds that Ripp lacked probable cause or arguable probable cause. Since "[t]he right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right" and the jury determined that neither probable cause nor arguable probable cause existed here, there can be no qualified immunity. Cayo v. Sefcik, 3:14CV38 JBA, 2014 WL 3419578, at *4 (D. Conn. July 11, 2014) (quoting Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)). Thus, the Court denies the Defendants' Fed. R. Civ. P. 50(b) motion and upholds the jury's verdict finding that Ripp liable on the Plaintiff's § 1983 false arrest claim.

**C. As to the Plaintiff's Fed. R. Civ. P. 59 Motion**

In the alternative, the Defendants argue that they are entitled to a new trial pursuant to Fed. R. Civ. P. 59, because "the verdict reached was the result of undue pressure and resulted in a miscarriage of justice[.]" (Def. Mem., pg. 12.) In this regard, the Defendants suggest that one of the jurors felt singled out for initially having a dissenting view from the other members of the jury. The Defendants base this contention on the following factors: (1) the jury sent out a series of notes indicating it was deadlocked; (2) a specific, identified juror asked to be excused; (3) the Court was advised on several occasions that the jury was divided eight to one; (4) the Court gave not only an Allen charge but subsequent paraphrased Allen charges; (5) the unfavorable weather conditions on November 27, 2013; and (6) the fact that November 27, 2013 was the day before the Thanksgiving holiday.

The Court disagrees. In this regard, the Court finds that the Allen charge and subsequent paraphrased Allen charges were neither coercive nor placed improper pressure on any juror. "It is well settled that there is nothing improper with instructions that encourage a deadlocked jury to reach a verdict, as long as jurors are not encouraged to abandon, without any principled reason, doubts that any juror conscientiously holds[.]" Baker v. Kirkpatrick, 768 F. Supp. 2d

493, 507 (W.D.N.Y. 2011) (citations and internal quotation marks and alterations omitted). Moreover, "[t]hat the trial court may have been aware that there was one holdout juror d[oes] not make the charge coercive[,]" so long as "the trial judge's instruction [does] not single out the juror in any improper or coercive fashion." Id. at 509–09 (citing U.S. v. Crispo, 306 F.3d 71, 77 (2d Cir. 2002) (where the court was aware that the jury was split eleven to one and the holdout juror revealed her identity, holding that "the fact that the judge knew that there was a lone dissenter does not make the charge coercive inasmuch as the nature of the deadlock was disclosed to the Court voluntarily and without solicitation")); see also U.S. v. Stinn, 379 F. App'x 19, 21–22 (2d Cir. 2010) (quoting Spears v. Greiner, 459 F.3d 200, 204 n.4 (2d Cir. 2006)) (holding that "the [d]istrict [c]ourt's supplemental charge to the jury regarding the refusal of Juror 10 to deliberate was [not] a coercive 'Allen' charge . . . , because there was no 'suggestion that jurors in the minority should reconsider their position.'").

In this case, each time the Court addressed the jury and provided them with an Allen charge or a paraphrased Allen charge, it made sure to emphasize that the jurors should not abandon their conscientious convictions or findings. Further, the Court even told the jury that it was "a very good group" and that the Court "really enjoy[ed] having [them]." (Tr. 1658.) Also, in speaking with the jury, at no point did the Court target the holdout or suggest that its instructions were only for that member or those members of the jury holding a minority viewpoint. At all times, the Court ensured that no pressure was placed on any juror to surrender his or her conscientious beliefs for the sake of reaching a verdict.

In fact, far from being coercive, the Allen charges at issue here were "helpful" since they "only expresse[d] encouragement to the jurors to reach a verdict, if possible, to avoid the expense and delay of a new trial" and always advised the jurors not to abandon their

17

conscientious convictions. U.S. v. Melendez, 60 F.3d 41, 41 (2d Cir. 1995), vacated on other grounds by Colon v. U.S., 516 U.S. 1104, 116 S. Ct. 900, 133 L. Ed. 2d 834 (1996). Indeed, the jury continued with its deliberations after receiving each Allen charge and did not immediately return a verdict. Rather, on the final day of deliberations, the Court gave the jury the third Allen charge at some point shortly after 10:30 a.m. on the final day of deliberations, and the jury did not return a verdict until 1:15 p.m. Thus, "there is no evidence here of any coercive effect 'as is sometimes asserted to exist when a verdict follows almost immediately after the giving of the Allen charge.'" Crispo, 306 F.3d at 77 (quoting U.S. v. Kahaner, 317 F.2d 459, 484 (2d Cir. 1963)).

Further, the fact that the Court gave three modified Allen charges does not mean that any juror was coerced. Even in cases where more than one Allen charge is given, "courts in this district have found the supplemental instruction coercive where the charge is replete with coercive and intimidating language, commentary on the evidence which was biased against the defense, and shaming harangues harshly attacking the jurors capacity to fulfill their role as jurors." Guardino v. Sabourin, 11 CIV. 6906, 2012 WL 6013022, at *23 (S.D.N.Y. Dec. 3, 2012) (citing U.S. v. McDonald, 835 F.Supp.2d 472, 482 (S.D.N.Y. 2011)) (internal quotation marks and brackets omitted). None of these problems are present here. See also Crispo, 306 F.3d at 76–77 (declining to find two Allen charges coercive even where the district court was aware that the jury was deadlocked eleven to one).

As a final matter, the Defendants speculate that the verdict was reached under pressure because the final day of deliberations, November 27, 2013, was the day before Thanksgiving and that the forecast for that date predicted inclement weather. However, the Defendants offer no evidence to support their conjecture in this regard.

Accordingly, the Court finds no grounds on which to disturb the jury's verdict. This is not "an egregious case" where the verdict must be set aside "to correct a seriously erroneous result, or to prevent a miscarriage of justice." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418–19 (2d Cir. 2012). Therefore, the Court denies the Plaintiff's Rule 59 motion for a new trial.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Defendants' motion pursuant to Fed. R. Civ. P. 50(b) and 59 is denied.

**SO ORDERED.**

Dated: Central Islip, New York
September 20, 2014

                ____*/s/ Arthur D. Spatt*____
                 ARTHUR D. SPATT
                United States District Judge